MILLIE METZROTH, as Administratrix of the Estate of CHARLES P. METZROTH, Deceased, Appellant, *v.* CITY OF NEW YORK et al., Respondents, Impleaded with Others.

Negligence — municipal corporations — New York city — streets — city charged with duty of keeping streets in reasonably safe condition — employees of building department, in interfering with streets, are servants and agents of city — death of pedestrian through collapse of shed over sidewalk — improper storage of building material thereon — actual and constructive notice to city — dismissal of complaint as against city improper — dismissal of complaint proper as to owner where possession had passed to lessee and it had nothing to do with work.

1. A city is charged with the duty either to close or keep and maintain its streets and highways in a reasonably safe condition for the use of the public, safe from dangers below or above. In so far as the employees of the building department interfere with the streets and highways, they are the servants and agents of the city, by and through whom it may have notice of conditions or be liable for nuisances created.

2. In an action to recover for the death of plaintiff's intestate occasioned by the collapse of a shed built over a sidewalk, open and in use by pedestrians, evidence that the city permitted the erection of the shed to protect pedestrians from falling material from a building in course of demolition; that the shed was insufficient for the purpose

of storing material upon it but that, nevertheless, tons of brick had been piled upon it for months, and for two weeks before its collapse heavy steel girders; that the architect had warned the contractors to remove the material, which could be seen from the street, and that during the time agents of the city, whose duty it was to inspect, had been upon the building, is sufficient to show both actual and constructive notice to the city of the improper use being made of the shed and of the danger to pedestrians arising therefrom. A dismissal of the complaint as against the city was, therefore, error.

3. The complaint was properly dismissed as to the owner of the building where possession thereof had passed to its lessee and it had nothing to do with the work being carried on.

*Metzroth* v. *City of New York,* 212 App. Div. 253, modified.

(Argued December 17, 1925; decided January 12, 1926.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 25, 1925, unanimously affirming a judgment in favor of defendants, respondents, entered upon a dismissal of the complaint, as to them, by the court at a Trial Term.

*Edward L. Blackman* for appellant. The city is liable for the negligence of the superintendent of buildings and his subordinates with respect to their supervision over structures upon the streets of the city of New York. (*Mayor, etc.,* v. *Furze,* 3 Hill, 612; *Conrad* v. *Village of Ithaca,* 16 N. Y. 158; *Hines* v. *City of Lockport,* 50 N. Y. 236; *Ehrgott* v. *Mayor, etc., of N. Y.,* 96 N. Y. 264; *Pomfrey* v. *Village of Saratoga Springs,* 104 N. Y. 459; *Henry* v. *City of Saratoga Springs,* 171 App. Div. 827; *Pittman* v. *City of New York,* 141 App. Div. 670; *Scott* v. *Village of Saratoga Springs,* 199 N. Y. 178.) The dismissal of the complaint upon the opening as against the Garfield National Bank was error. (*Hoffman House* v. *Foote,* 172 N. Y. 348.)

*George P. Nicholson,* Corporation Counsel (*John F. O'Brien* and *Henry J. Shields* of counsel), for City of New York, respondent. The city is not liable on account

of the issue of the permit, which was required by law to be issued, nor on account of the manner in which the shed was constructed. (*Masterson* v. *Village of Mt. Vernon,* 58 N. Y. 391; *Village of Port Jervis* v. *First Nat. Bank,* 96 N. Y. 550; *Crowley* v. *Rochester Fireworks Co.,* 183 N. Y. 353; *Smyth* v. *City of New York,* 203 N. Y. 106, 110; *Lyman* v. *Village of Potsdam,* 228 N. Y. 398; *Agramonte* v. *City of Mt. Vernon,* 112 App. Div. 291; *Buckley* v. *City of New York,* 135 App. Div. 512; *Mc Namara* v. *City of New York,* 144 App. Div. 504; *Von Lengerke* v. *City of New York,* 150 App. Div. 98; 211 N. Y. 558.) There is no evidence that the city had notice, even of an implied or constructive character, of such a distribution of weight on the shed as would appear improper to a reasonable person. Plaintiff's witnesses agree that the shed seemed safe. (*Orsen* v. *City of New York,* 193 N. Y. 537; *Schmidt* v. *City of New York,* 179 App. Div. 667; 228 N. Y. 573.) The bureau of buildings had exclusive jurisdiction over this shed. The superintendent of buildings and the employees of the bureau of buildings exercise governmental functions and are not such agents of the city as render it liable for their errors of judgment or even for their negligence. (*Connors* v. *Mayor,* 11 Hun, 439; *Fire Dept.* v. *Atlas S. S. Co.,* 106 N. Y. 566; *Stubley* v. *Allison R. Co.,* 124 App. Div. 162; *McGuinness* v. *Allison R. Co.,* 46 Misc. Rep. 8; 111 App. Div. 926; *Smyth* v. *City of New York,* 203 N. Y. 106; *Carpenter* v. *City of New York,* 115 App. Div. 552; *Murphy* v. *City of New York,* 128 App. Div. 463.)

*David C. George* for Garfield National Bank, respondent. The dismissal of the complaint as to the Garfield Bank was right and was fully warranted by the facts subsequently developed. (*Clancy* v. *Byrne,* 56 N. Y. 129; *Wolf* v. *Kilpatrick,* 101 N. Y. 146; *Trustees of Canandaigua* v. *Foster,* 156 N. Y. 354.) A landlord out of possession, who has leased his premises in their entirety,

is liable neither for the negligence of the tenant nor for a nuisance created or maintained by the tenant. (*Clancy v. Byrne*, 56 N. Y. 129; *Swords v. Edgar*, 59 N. Y. 28; *Ryan v. Wilson*, 87 N. Y. 471; *Edwards v. N. Y. & H. R. Co.*, 98 N. Y. 245; *Wolf v. Kilpatrick*, 101 N. Y. 146; *Ahern v. Steele*, 115 N. Y. 203; *Martin v. Pettit*, 117 N. Y. 118; *Trustees of Canandaigua v. Foster*, 156 N. Y. 354; *Babbage v. Powers*, 7 N. Y. Supp. 306; 130 N. Y. 281; *Black v. Maitland*, 11 App. Div. 188; *Curran v. Flammer*, 49 App. Div. 293; *Jones v. Brumme*, 120 App. Div. 495.)

CRANE, J. On March 24, 1920, about five o'clock in the afternoon, Charles P. Metzroth was walking on Forty-ninth street near Seventh avenue, assuming, of course, that the street was perfectly safe, as it was open and in use by pedestrians. While he was thus passing along the sidewalk, five tons of brick and steel girders fell upon him, crushing and killing him. An overhead shed, upon which these materials had been stored, collapsed and gave way with this disastrous result.

That the overhead shed was insufficient is self-evident. That the inspectors of the city, charged with a duty toward the public regarding these matters were unable to discover the danger is the present claim of the corporation counsel in this action which has been brought to recover for the death of Metzroth.

That the city is charged with the duty to keep and maintain its streets and highways in a reasonably safe condition for the use of the public is so well established that there is no attempt here to question the statement. This duty the city itself cannot shift to other persons. (*Bieling v. City of Brooklyn*, 120 N. Y. 98.) Unless the Legislature has seen fit to relieve or limit this responsibility the duty remains and must be performed. It has not been shifted to the building department as such. (*Ehrgott v. Mayor, etc., of City of N. Y.*, 96 N. Y. 264; *Scott v. Village of Saratoga Springs*, 199 N. Y. 178;

*Henry* v. *City of Saratoga Springs*, 171 App. Div. 827; *Hines* v. *City of Lockport*, 50 N. Y. 236; *Lockwood* v. *Dover*, 73 N. H. 209; *Niven* v. *City of Rochester*, 76 N. Y. 619; *Kleopfert* v. *Minneapolis*, 93 Minn. 118.)

The corporation counsel now urges that even though the city is responsible for the safety of the streets and highways, yet as the building department, a branch of the city government, has control of the erection of buildings in the exercise of the police power of the State, it also has control of a shed over a sidewalk put up to protect pedestrians from falling material during the course of such erection. The shed coming within the building regulations based on police power, the city has no duty to keep it safe for travelers on the highway. The function of supervision is governmental, not administrative. In other words, although the city may be liable for a defective bridge substituted for a sidewalk *over* which people walk (*Parks* v. *City of New York*, 111 App. Div. 836; affd., 187 N. Y. 555), it cannot be liable for a defective shed *under* which they walk. There can be no such distinction, as none exists in fact or in principle. The city can close a street if there be any question regarding its safety or condition for use. When it leaves a sidewalk open to the public, people have a right to assume that the city has fulfilled its legal obligations, and that the place is reasonably safe to walk upon, safe from dangers below or above. Whatever may be the nature of the duties of the building department regarding buildings, in so far as the employees of that department interfere with the streets and highways, they are the servants and agents of the city, by and through whom it may have notice of conditions or be liable for nuisances created. (See above cases.)

These principles become more apparent when applied to the facts of this case. This is not a case of nuisance, but of negligence. The shed which was erected may have been proper to protect pedestrians from falling material

(I do not say that it was), and it may have been insuffi-
cient for the purpose of storing material on the top of it.
If it were sufficient for any purpose, but improperly used,
the city would not be liable until it had notice, either
actual or constructive, of the danger arising from such
improper use. The evidence in this case is sufficient to
show in my judgment both actual and constructive
notice to the city of the improper use being made of the
shed, and of the danger to pedestrians arising therefrom.
The dismissal of the complaint as against the city was,
therefore, error. Let me state the facts more in detail.

The Garfield National Bank was the owner of premises
at the northwest corner of Seventh avenue and Forty-
ninth street which it had leased to a corporation known
as "742 Seventh Avenue Corporation." The building
on the premises was to be torn down, and a new building
erected. Tearing down the building would cause danger
from falling material to people passing in the street.
Such condition was recognized and provided for in the
building code and in the charter of the city of New York.
The parties complied with these provisions and procured
from the borough president and the highway department
a permit to erect the shed over Forty-ninth street.

The provisions of law applicable are the following:
Section 191 of the building code reads: " Whenever any
building or part thereof, within ten feet of the building
line, is to be erected or raised to exceed forty feet in
height, or whenever such a building more than forty feet
in height is to be demolished, the owner or the person
doing or causing such work to be done shall erect and main-
tain during such work a *substantial shed* over the sidewalk
in front of said building and extending, so far as
practicable, from building line to curb. * * * Such
shed shall remain in place until the building is enclosed,
or, in case of demolition, until the building has been
reduced to twenty feet in height. Every such shed shall
be kept properly lighted at night." Section 50 of the

charter of the city of New York provides that the board of aldermen shall have power to regulate the use of streets and sidewalks by foot passengers, but *shall not* have the power to authorize the placing or continuing of any encroachments or obstructions *upon* any street or sidewalk except the temporary occupation thereof during the erection or repairing of a building on a lot opposite the same. By section 383 of the charter the president of the borough is given the right to issue permits to builders and others to use or open the streets. The bureau of buildings, by title II of the charter, is made a part of the office of the •borough president, and in Manhattan the borough president may appoint a superintendent of buildings for that borough. Other provisions of this title specify the duties of the superintendent of buildings and of his department.

Pursuant to these provisions, the president of the borough of Manhattan, bureau of highways, issued a temporary roof and shed permit " To ERECT AND MAINTAIN A TEMPORARY ROOF OR SHED, 100 feet long, over the sidewalk in front of the building and premises at N. W. Cor. 7th Ave. & 49th St. upon the following conditions:

" 1. The portion of the sidewalk to be covered shall include all of that between the building line and the curb. * * *

" 4. The construction of the roof or shed shall be of sufficient firmness and strength to withstand the weight of all material placed or falling thereon, and the holder of this Permit assumes all liability for loss or damage to persons or property that may occur through faulty construction or neglect to comply with this provision.

" This Permit is issued subject to the strict observance of all laws, ordinances and regulations enacted for the protection of the City so far as they may apply.

" M. F. LOUGHMAN,<br>" <em>President of the Borough.</em>"

The use of the word "substantial" in the ordinance and the word "sufficient" in the permit is of course relative to the use which is to be made of the shed. They mean nothing unless the city and its officials know what use is to be made of the structure. Section 200 of the Building Code requires all old material to be "lowered to the ground immediately upon displacement."

The shed was erected by the builders and their sub-contractors, and was apparently sufficient to protect persons from falling material. There is evidence both ways upon this point. There is some testimony to show that the shed as erected was insufficient even for this purpose, and not in accordance with the plans and orders of the building department. That it was insufficient for carrying building material was fully established by the testimony; at least there is evidence from which a jury could find that such was the fact. Beginning with January up to the day of the collapse, three to four thousand brick, amounting to about five tons, were piled upon that portion of the shed which broke, and heavy steel girders, a few weeks before the collapse were also placed there, adding to the weight. In the meantime, people all unmindful of the danger, and relying upon the inspection of inspectors who did not inspect, were passing on their way underneath this load. On the 24th of March, 1920, this portion of the structure with its weight fell upon Charles P. Metzroth, killing him.

Rudolph P. Miller, the superintendent of buildings for the borough of Manhattan, testified that the permit was *not* issued for the purpose of carrying material upon the shed, and that it was altogether insufficient for the weight placed upon it. Was the city ignorant of this condition? Building inspectors visited this building and this portion of the sidewalk covered by this shed and must have seen and known of its use for storing brick and building material. The shed was only seven or eight feet above the sidewalk, with a fence along its edge,

made out of old doors placed lengthwise. The brick were piled up above these doors, or fence, so as to be seen from the street. The condition had existed for weeks and months, during which time building inspectors were on the job. They were agents of the city, regarding this obstruction in the street and highway. Notice to them was notice to the city of any defective or dangerous condition making it unsafe for public travel. Even if they did not have actual notice of these conditions, the city is to be charged with constructive notice under the circumstances due to the lapse of time. Inspectors are supposed to inspect, and it is not sufficient answer to say that they did not see what any reasonable person could have seen in going upon or near the shed. Inspectors do not inspect from the building department offices or from the street; they go in and upon buildings, or at least are supposed to do so. What they should have seen and in the exercise of reasonable diligence could have seen, the city is charged with seeing. The charter (§ 406) requires them to enforce the building ordinance about removal of buildings. Thus, if this shed, inappropriate for carrying material, had stored upon it tons of brick, making it unsafe for pedestrians, and this condition had existed for months, during which time building inspectors were at the place, the city may be charged with notice of such user and condition. There is evidence here from which a jury might find both actual and constructive notice.

It may be well, however, to refer somewhat more in detail to the evidence, as we are passing upon the question whether or not there was any evidence to take this case to the jury.

Otto Stautt, the architect and superintendent of structure, had made a complaint to Mr. Gold, an officer of the " 742 Seventh Ave. Corporation," about the bricks being deposited on the shed, and Mr. Gold stated that they would be removed. What an architect could

see was improper, surely a building inspector could find
out. He also says that there were three to four thousand
brick piled in the place where the shed collapsed and that
the steel girders were also on the shed for about two weeks
prior to March twenty-fourth, together with planks,
mortar boxes, tools and implements of the bricklayers.
His order to Gold to remove the bricks was given a month
before the accident. The bricks had been on the shed
for several months, weighing from four and a half to
five tons. This witness also saw the building inspector
making notes. Otto Stautt also swears that the ordinary
use for an overhead structure of this type was simply
for the protection of pedestrians from falling bricks and
debris. To quote him, we have this question and answer:
" Q. When you said you considered that bridge a sub-
stantial bridge, for what purpose do you mean it was
substantial? A. Substantial for the protection of
pedestrians that it was intended for. Q. You understood
that that bridge was erected to prevent materials from
falling from the building and striking pedestrians on the
head, as they walked along the street? A. Yes, sir."

In this the architect is supported by Rudolph P. Miller,
the superintendent of buildings for the borough of Man-
hattan, who testified: " The department does not object
to the storing of material on the shed, provided the shed
is constructed with that end in view, as well as serving
its purpose as a sidewalk shed." Again he swore regarding
this shed in question: " Well, we only recognized the
shed as a sidewalk shed built for the protection of
pedestrians, and passed as that kind of a shed; and what
I saw of that shed remaining when I made my inspection
of the rest of it, was of the same construction, and there
had been no change in it. I am of the opinion that it
was a substantial shed, and served the purpose that the
law intends. * * * Sufficient to protect pedestrians
who may have to use the sidewalk, against the falling
material that is liable to come down occasionally from

buildings in course of construction." That the building inspectors were on the job is testified to by Elias J. Lyon, an officer of one of the defendants, the Greenwich Associates, who testified that he saw Mr. Shields, the city inspector, at the place several times while the brick was on the bridge; that he made remarks to the inspectors and made appointments with them.

But the inspectors did not have to go into the building to see that material was being piled upon the shed. The witness Charles Hartman, who did business in the neighborhood, testified, " You could see the brick, the red brick, above the partition that was holding the brick from falling in the gutter, above that."

Taking, therefore, this evidence most favorable to the plaintiff, we find that the city permitted the erection of a shed to protect pedestrians from falling material while the building was in the course of demolition. The shed was not erected for the purpose of storing material upon it. It was insufficient for that purpose. The architect knew this, and had warned the contractors to take the material off. The building superintendent examining the structure after its collapse says that it was not erected for the purpose of storing material. Tons of brick had been piled upon the shed for months, and two weeks before its collapse, heavy steel girders. During this time agents of the city, employees whose duty it is to look about and see things, had been upon the building. They must have seen what everybody else apparently knew, that this weight was being placed on a frame structure over the heads of multitudes of people passing beneath.

Faced with this evidence, and its duty under the law to either close streets or else to keep them reasonably safe for public travel, can the city claim that there was no evidence of its dereliction in this particular? I think not.

The complaint was dismissed as to the Garfield National Bank, the owner, and properly so; possession of the

property had passed to its lessee. It had nothing to do with the work here spoken of. This judgment should be affirmed, with costs.

The plaintiff apparently has also appealed from the judgment in favor of Jacob Volk and the Jacob Volk House Wrecking Company. This judgment was entered upon a verdict for these defendants. We do not find this appeal seriously pressed, and little or no reference made to it in the briefs. A verdict on conflicting evidence raises a question of fact which we cannot disturb. This judgment should, therefore, be affirmed, with costs.

The dismissal of the complaint on motion of the city, at the end of the plaintiff's case was unjustified, by reason of what I have here stated; and the judgment in its favor, affirmed by the Appellate Division, should be reversed and a new trial granted, costs to abide the event.

HISCOCK, Ch. J., CARDOZO, POUND, McLAUGHLIN, ANDREWS and LEHMAN, JJ., concur.

Judgment accordingly.